Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel II

| EL PUEBLO DE PUERTO RICO<br>Recurrido<br><br>v.<br><br>ZAIDA COLÓN JUSTINIANO<br>Peticionaria | KLCE202301125 | *Certiorari*<br>procedente del<br>Tribunal de<br>Primera Instancia,<br>Sala de Bayamón<br><br>Caso Núm.<br>D LE2022G0065<br>D LE2021M0062<br><br>Sobre:<br>ART. 7.06 y 7.02 Ley<br>de Vehículos y<br>Tránsito (Ley 22) |

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Adames Soto y la Juez Aldebol Mora

Adames Soto, Juez Ponente

## **RESOLUCIÓN**

En San Juan, Puerto Rico, a 19 de marzo de 2024.

a.

Comparece la señora Zaida E. Colón Justiniano (la peticionaria), mediante recurso de *certiorari,* solicitando que revoquemos una *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón, (TPI), el 23 de agosto de 2023. Mediante esta, el foro *a quo* declaró *No Ha Lugar* la *Moción de Supresión de Evidencia*[1] presentada por la peticionaria.

Sostiene ante nosotros la peticionaria que, sopesada la evidencia que tuvo ante su consideración el foro recurrido, este debió de haber ordenado la supresión de la prueba de sangre que se le tomó, pues fue obtenida sin su consentimiento, establecido ello por la continua y reiterada negativa que mostró para que la realizaran.

Por los fundamentos que expondremos a continuación, denegamos expedir el recurso solicitado.

---

[1] La Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, R. 234, es el estatuto que instrumenta el mandato constitucional de exclusión de evidencia ilegalmente obtenida, disponiendo que una persona agraviada por un allanamiento o registro ilegal podrá solicitar la supresión de dicha evidencia. *Pueblo v. Rolón Rodríguez,* 193 DPR 166 (2015).

b.

Por hechos ocurridos el 16 de enero de 2021, el Ministerio Público le imputó a la peticionaria haber cometido sendos delitos, según tipificados en la *Ley de Vehículos y Tránsito de Puerto Rico*, Ley Núm. 22-2000, 9 LPRA sec. 5001 *et seq.*, en específico, por infracción a los artículos 7.02, y 7.06 de dicho estatuto.

Luego de que fuera determinada causa para el arresto[2], y posteriormente celebrada la vista preliminar[3], en la cual se halló causa para acusar por las imputaciones según presentadas, la peticionaria presentó el 17 de enero de 2023 una *Moción de Supresión de Evidencia*. Como fundamento para su solicitud, esgrimió, en síntesis, que las muestras de sangre extraídas de su cuerpo, con las que se realizó la prueba sobre el por ciento de alcohol, no se obtuvieron de conformidad con los parámetros legales y constitucionales pertinentes. En específico sostuvo que, sopesadas sus acciones en el hospital al momento en que le tomaron dichas muestras, se debió haber entendido que no consintió a que se la tomaran, (según sus expresiones no verbales), lo que hacía necesario obtener una orden judicial para ello. Añadió, que la Policía de Puerto Rico contó con el tiempo suficiente para solicitar una orden judicial para obtener las muestras de sangre, por lo que no se justificaba que se las tomaran, sin la intervención previa del Tribunal. Asimismo, adujo que las advertencias de ley realizadas por el agente interventor fueron defectuosas, y al tomarles las muestras tampoco se siguieron varias disposiciones esenciales provenientes del Reglamento 9234 del Departamento de Salud.

A raíz de ello, el Ministerio Público presentó escrito en oposición a la solicitud de supresión de evidencia aludida.

---

[2] Regla 6 de Procedimiento Criminal, 34 LPRA Ap. II, R. 6.
[3] Regla 23 de Procedimiento Criminal, 34 LPRA Ap. II, R. 23.

En consecuencia, el TPI ordenó celebrar la correspondiente vista de supresión de evidencia. Dicha vista fue celebrada los días 8, 9, y 11 de agosto de 2023. Allí, el Ministerio Público presentó como su prueba el testimonio de las siguientes personas: la señora Viviana Alicea Benítez (en adelante, señora Alicea o la enfermera); el agente Antonio E. Hernández Meléndez (en adelante, agente Hernández); el agente Francisco Ortiz Ríos (en adelante, agente Ortiz); y el químico del Departamento de Salud Salvador Fabre Rivera (en adelante, señor Fabre), además de prueba documental.

La valoración de la prueba testifical presentada en la vista de supresión de evidencia resulta de la mayor importancia en la controversia principal alzada ante nosotros por la peticionaria, (la presunta ausencia de consentimiento para que se le tomara la prueba de sangre), por lo que, a continuación, recogemos un resumen de lo declarado por los testigos, pertinente al asunto que nos toca dilucidar.

**Testimonio de Viviana Alicea Benítez**

Declaró que es enfermera graduada desde el 2002, cuando alcanzó el grado de bachillerato en enfermería, y posee una maestría en educación. Labora como enfermera en el hospital Doctor's Center de Bayamón, además ha trabajado en Metro Pavía de San Juan, en el Hospital Regional de Carolina y en el Centro Médico Correccional. Tiene la certificación que emite el gobierno, luego de haber aprobado los exámenes que ofrece la Junta Examinadora del Departamento de Salud, la cual se renueva cada cuatro años. Además, toma los cursos de educación continua que le son requeridos por la Junta Examinadora del Departamento de Salud y, para el 16 de enero de 2021, tenía vigente su licencia de enfermera. A esta prueba testifical el Ministerio Público la acompañó con la presentación de

los documentos marcados como: Exhibit 1-1 del Ministerio Público[4], Exhibit 1-2 del Ministerio Público[5] y el Exhibit 1-3 del Ministerio Público.[6]

Con la objeción por parte de la defensa, el Ministerio Público presentó los exhibits 2 y 3, relacionados a las credenciales de la señora Alicea, las cuales estaban vigentes para el 16 de enero de 2021. Entre otras cosas, estas credenciales autorizan a la testigo a ejercer su profesión de enfermera generalista sin restricciones y/o condiciones.

La señora Alicea también declaró que sus funciones en la sala de emergencias del Hospital Doctor's Center incluyen asistir en el área de *triage*[7], lo cual abarca recibir ambulancias, realizar el historial del paciente, hacer el cernimiento inicial, tomar los vitales y las muestras de sangre, administrar medicamentos. Los turnos de trabajo tienen una duración de ocho horas, en el cual se pueden llegar a tomar hasta veinticinco (25) muestras de sangre. Como parte de los cursos de educación continua, a iniciativa propia, **tomó el curso de flebotomista.** Afirmó que cuando toma pruebas de sangre y un paciente retira el brazo, o se niega a que se le tome, ***"pues no la tomo"***.[8] Enfatizó que no toma las muestras de sangre bajo dichas circunstancias porque **"el paciente determina que yo le estoy violando sus derechos y si retira el brazo me puedo pinchar"**.[9] Declaró estar familiarizada con la toma de muestras de sangre para detectar los niveles de alcohol, debido a que había realizado el procedimiento unas tres a cinco veces previo a la muestra tomada el 16 de enero de 2021.

El día de los hechos comenzó su turno a las 11:00 de la noche, se encontraba laborando en el área de *triage*, cuando se percató que llegó una ambulancia con la acusada, observándola cuando fue bajada de esta

---

[4] Diploma de Bachillerato en Enfermería.
[5] Licencia Permanente del Departamento de Salud #38099.
[6] Renovación de licencia.
[7] Área del hospital donde se evalúa al paciente, una vez llega al hospital y se determina la severidad de su estado, para entonces poder ser referido al correspondiente cuidado y monitoreo.
[8] Apéndice 4 del *Certiorari*, pág. 305.
[9] *Íd.*

por los paramédicos y transferida a una camilla del hospital. Entonces, los paramédicos le ofrecieron la información que previamente habían obtenido de la paciente, por lo que procedió a recibirla, observarla, confirmando su nombre, información e historial médico. Además, la enfermera le hizo preguntas a la acusada para determinar su orientación y le explicó lo que le haría, corroborando que entendía lo que le decía. Aclaró que lo dicho se hacía porque si la paciente no entendía lo que se le explicaba entonces era necesaria la presencia de un familiar. La enfermera manifestó que, durante la interacción con la paciente, esta fue responsiva, tomándole los vitales posteriormente y completando el proceso de *triage*. Concluido este proceso, la paciente es evaluada por el médico.

La enfermera continuó testificando que, luego de lo narrado, llegaron los agentes, acercándosele el agente Hernández para solicitarle que realizara el proceso de extracción de sangre a la acusada, el cual tuvo una duración aproximada de quince minutos. Indicó que el agente Hernández le hizo entrega del *kit* para tomar la muestra de sangre, el cual se encontraba sellado, verificando la fecha de vencimiento y rompiendo el sello en presencia de la paciente y de los agentes. Luego de haber abierto el *kit*, explicó que retiró el contenido de este, el cual incluía tres tubos de muestra, hojas con instrucciones y Betadine. Leídas las instrucciones contenidas en el *kit*, estuvo lista para realizar la extracción.

La enfermera declaró que, previo a la toma de la muestra, a la paciente no se le había suministrado ningún medicamento. Por tanto, procedió a comenzar con la toma de la muestra, para lo que le preguntó el nombre a la paciente, le explicó que le tomaría una muestra de sangre, y le preguntó si estaba de acuerdo. La enfermera declaró que a su pregunta, la acusada respondió **extendiendo su brazo**[10] y diciendo **"dale, dale"**[11]. Luego de la acusada extender el brazo, la enfermera procedió a realizarle

---

[10] Apéndice 10 del *Certiorari*, pág. 322.
[11] *Íd.*

un torniquete, le limpió con Betadine el área y extrajo la muestra de sangre para los tres tubos, todo en presencia de los agentes. Manifestó la enfermera que durante el proceso descrito **la paciente no retiró su brazo, ni solicitó que se detuviera el proceso** y, según pudo apreciar, no mostraba ningún trauma físico. Al culminar el proceso la enfermera colocó dos tubos en el *kit* de recolección y le entregó el tercer tubo a la paciente, manifestando que el *kit* fue sellado con un *label* de color rojo en presencia de los agentes y de la acusada, para luego hacer entrega de este al agente Hernández.

Continuó declarando la misma testigo que procedió a llenar uno de los documentos del *kit*, titulado *Parte Remisión*, pero no lo completó, dejando en blanco algunos encasillados. Además, el apartado para la firma de la paciente como recibo de la muestra fue firmada por el agente Hernández, pues la acusada verbalizó que no quería firmarlo. La enfermera adujo no recordar qué hizo con la hoja que correspondía entregar a la paciente como evidencia de la entrega de la muestra.

Correspondiendo el turno a la defensa para contrainterrogar a la enfermera, esta declaró que la hoja de instrucciones para la toma de muestras incluidas en el *kit* fue descartada por ella luego de haberlas leído. La defensa presentó su primer exhibit[12] la *Hoja Informativa al Flebotomista*, de la cual la enfermera declaró no reconocer y tampoco recordaba de qué se trataba ese documento. Además, se presentó el Exhibit 2 de la defensa, titulado *Hoja Informativa al Intervenido*, de la cual la enfermera testificó no haberla visto.

Durante esta etapa del contrainterrogatorio, la señora Alicea declaró que no estuvo presente en todo momento con la acusada[13], y no vio al agente hacerle las advertencias de ley. Aseveró haber observado que la acusada no quería firmar los documentos a los agentes, estando el esposo

---

[12] Exhibit 1 de la defensa, Hoja Informativa al Flebotomista.
[13] Apéndice 10 del *Certiorari*, pág. 366

allí presente, pero distante del lugar en que ella se encontraba con estos, a unos veinte pies. Además, respecto al esposo la enfermera expresó, que no lo observó instar a la acusada a que cooperara con el proceso.

La paciente fue confrontada con sus declaraciones previas, dadas durante la vista preliminar, en las que admitió que el esposo de la paciente estuvo presente durante la toma de la muestra, a lo cual respondió no recordar. A preguntas de la defensa, la testigo aseveró que, **para tomarle la muestra a la acusada, no tuvo que estirarle el brazo**[14]. Esta se reiteró, además, en que no recordaba lo que hizo con la hoja que debía entregar a la acusada, aunque sí recuerda que la paciente no quiso firmar, y haberle entregado el tubo que le correspondía.

**Testimonio de Francisco Ortiz Ríos**

El agente Francisco Ortiz Ríos declaró que es agente de la Policía de Puerto Rico desde el año dos mil, perteneciendo a la División de Tránsito de Bayamón desde hace veinte años. Manifestó que el 16 de enero de 2021 le fue asignado, junto al sargento Trinidad, investigar los accidentes que ocurrieran esa noche. En esa fecha recibió por radio información relacionada a un accidente de tránsito de carácter grave, en la Carretera Núm. 6 de Bayamón, eran como las 10:00, 10:30 de la noche, cuando acudió a la escena. Declaró que al llegar al lugar pudo observar un Hyundai Tiburón de color azul, y un Mini Cooper azul, que habían chocado de frente en el área del carril derecho, que va de Norte a Sur. **Los vehículos eran conducidos por la señora Zaida y Isaac.**

Estando en el lugar de los hechos, procedió a **comunicarse con los agentes Lasalle y Hernández**, pues necesitaba apoyo en la escena, de manera que estos acudieran al hospital para que se realizara la prueba de sangre a uno de los conductores, y le ayudaran a medir la escena. Continuó declarando que, al llegar estos agentes a la escena, les mencionó el nombre de la acusada, describió la vestimenta que llevaba y que había

---

[14] Apéndice 10 del *Certiorari*, pág. 383.

sido trasladada al Hospital Doctor's Center en Bayamón. Entonces, instruyó a los agentes a que acudieran al cuartel a buscar un *Jet Pack* y lo llevaran al hospital, para que le tomaran la muestra de sangre a la conductora como parte del protocolo de accidentes fatales.

Llegado el turno del contrainterrogatorio, el agente Ortiz declaró que, para él, la acusada era la sospechosa de haber causado el accidente que investigaba esa noche.

**Testimonio del agente Antonio E. Hernández Meléndez**

El agente Antonio E. Hernández Meléndez, declaró que es agente de la Policía de Puerto Rico desde hace trece años, y durante los últimos doce ha laborado en la División de Tránsito de Bayamón. Explicó que, como parte de sus funciones, ha tomado adiestramientos en el manejo de máquinas *Intoxilyzer*, radar, fotómetro, Ley 22,[15] y el manejo de accidentes fatales. Además, afirmó tener las certificaciones que emiten tanto el Departamento de Salud, como el Negociado de Tránsito, para operar las máquinas que se utilizan para medir el porciento de alcohol, mediante prueba de aliento.

Respecto al día de los hechos, declaró que el 16 de enero de 2021 trabajó un turno que comenzó a las 6:00 de la tarde, y terminó a las 2:00 de la mañana. Ese día el sargento Trinidad le impartió instrucciones para que él y su compañero, el agente Lasalle, impactaran las carreteras de Bayamón, Cataño y Vega Baja, y las personas conduciendo bajo los efectos del alcohol. A eso de las 10:30 de la noche recibió una llamada del agente Ortiz, quien por instrucciones del sargento Trinidad, le indicó que acudiera a la escena de un accidente fatal en la Carretera Núm. 6. Una vez llegan a la escena, el agente Ortiz les solicita ayuda y que, como parte del protocolo de accidentes fatales, acudieran al Hospital Doctor's Center, donde se encuentra la conductora de la Mini Cooper, y le informa que el conductor del Hyundai Tiburón había fallecido, habiendo sido trasladado

---

[15] A todas luces, se refiere a la *Ley de vehículos y tránsito de Puerto Rico*, Ley 22-2000.

al hospital Hima. Según se le requirió, acudió al cuartel a buscar un *Jet Pack*, y posteriormente fue al hospital Doctor's Center.

Al llegar al mencionado hospital, se identificó con el personal de seguridad y, al entrar al área de *triage*, identificó a la señora Zaida Colón Justiniano con la descripción que le proveyó el agente Ortiz, que vestía una camisa blanca y pantalón crema. Cuando los agentes se acercaron a la acusada, **la enfermera no se encontraba presente**. Procedió entonces el agente a identificarse con la acusada, indicarle las razones por las que se encontraba allí y, luego, a leerle las advertencias para las personas bajo los efectos de alcohol, todo en presencia del esposo de la acusada. Narró que, al terminar la lectura de las advertencias, **le preguntó a la acusada si las entendía y esta afirmó con su cabeza que las entendía**. Sin embargo, al agente solicitarle a la acusada que **firmara las advertencias, esta se negó con la cabeza,** por lo que el agente Lasalle procedió a firmar en su lugar. A pesar de negarse a firmar las advertencias, el testigo describe que la acusada se mostraba **tranquila, cooperadora y parecía entender el proceso**. El agente Hernández declaró que **se encontraba a 3 pies de la acusada, y a un pie de la enfermera, mientras que el esposo se encontraba al pie de la camilla**. Testificó haber observado a la acusada con los **ojos rojizos y la piel sudada**.[16]

Luego de cumplimentar la parte de las advertencias, el agente procedió a solicitarle a la enfermera que realizara la toma de la muestra de sangre, para lo cual le entregó el *Jet Pack*. Acto seguido la enfermera retiró el contenido de allí, verificó "el pote", leyó las instrucciones y le explicó a la acusada todo el proceso. Manifiesta el testigo que, durante la explicación de la enfermera, la acusada realizaba todo lo que le indicaba la enfermera. **En un momento dado luego de la explicación de la enfermera, el agente tuvo la impresión de que la acusada no quiso extraerse la sangre, pues la acusada retiró el brazo en uno o dos ocasiones y que**

---

[16] Apéndice 4 del *Certiorari*, pág. 90.

**el esposo a iniciativa propia intervino y le dijo "calma, todo está bien, no lo dañes, sigue las instrucciones".**[17]

Este testigo continuó declarando que la enfermera le explicó el proceso a la acusada en dos o tres ocasiones, diciéndole que el proceso se realizaría con calma, que no le dolería y que era parte del protocolo, **y es ahí cuando extiende el brazo.** Previamente el brazo de la acusada estuvo "enconado" y pegado a su cuerpo, **esto duró un corto tiempo. Acto seguido la enfermera le estira el brazo**, porque según el testigo "es parte de su trabajo", **con el brazo libre la acusada hizo gestos a la enfermera para que avanzara.** Culminado el proceso de extracción, testifica el agente que le hizo entrega de la muestra correspondiente a la acusada y procedió a solicitarle la firma para el *Parte de Remisión.* Manifestó que, ante la negativa de la acusada de firmar el documento que evidenciaba la entrega de la muestra, le solicitó al esposo que interviniera, que le ayudara. La acusada continuó en la negativa en firmar, por lo que el agente firmó el documento, colocando la hora de finalización del proceso como las 11:44 de la noche, y entregándole la muestra y el documento.

Durante el redirecto, este testigo aseguró que no buscó una orden judicial para realizar la prueba de sangre, *porque la orden se solicita cuando la persona se niega rotundamente a realizarse la prueba, en este caso accedió pues, no es necesario activar lo que es la llamada a un fiscal para eso.*

Además de los testimonios aludidos aquí resumidos, el Ministerio Público presentó el testimonio de un perito y once *exhibits*[18], mientras que la defensa presentó dos *exhibits.*[19]

---

[17] Apéndice 4 del *Certiorari*, pág. 101.

[18] Exhibit 1-1 del Ministerio Público, Diploma de Bachillerato en Ciencias de Enfermería otorgado a Viviana Alicea Benítez en junio de 2000.
   Exhibit 1-2 del Ministerio Público, Licencia Permanente de Enfermera Generalista otorgada a Viviana Alicea Benítez expedida el 18 de marzo de 2013.
   Exhibit 1-3 del Ministerio Público, Diploma de Maestría en Educación otorgado a Viviana Alicea Benítez en diciembre de 2019.
   Exhibit 2 del Ministerio Público, Certificado de Registro de la Oficina de Reglamentación y Certificación de Profesionales de la Salud otorgado a Viviana Alicea Benítez el 20 de

Sometido el asunto por las partes para que fuera adjudicada la solicitud de supresión de evidencia, el TPI emitió *Resolución* declarándola *No Ha Lugar*. En su muy fundamentada *Resolución* el foro recurrido exhibió rigor en las valoraciones que hizo sobre la prueba testifical que desfiló ante sí y sopesó, para entonces concluir, en síntesis, que: (1) **la peticionaria había consentido implícitamente a la toma de muestra de sangre sin una orden judicial previa; (2) el proceso llevado a cabo por la enfermera en la obtención de la referida muestra de sangre y envío a su análisis no invalidaron su resultado; (3) el agente Hernández cumplió con su deber de informar a la peticionaria de sus derechos.**[20] El TPI fue cauteloso al plasmar o dejar constancia expresa de **haberle concedido entero crédito a la prueba testifical** presentada por el Ministerio Público, atinente a los asuntos enumerados en la oración que precede.

Luego de la peticionaria haber instado una petición de reconsideración ante el tribunal *a quo*, que fue denegada, entonces compareció a este Foro intermedio, mediante recurso de *certiorari*, planteando los siguientes errores:

> **PRIMER ERROR**: Erró el Tribunal de Primera Instancia al determinar que no procedía solicitar una orden de registro y allanamiento, según lo ordena el artículo 7.09 (a) de la Ley Número 22 de 7 de enero de 2000, según enmendada, por la

---

junio de 2018.

Exhibit 3 del Ministerio Público, Certificado del Departamento de Salud, de la Oficina de Reglamentación y Certificación de Profesionales de la Salud otorgado a Viviana Alicea Benítez el 19 de julio de 2023.

Exhibit 4 del Ministerio Público, Parte de Remisión.

Exhibit 5 del Ministerio Público, Informe de Análisis Toxicológico de Zaida E. Colón Justiniano de 1 de marzo de 2021.

Exhibit 6 del Ministerio Público, Advertencias a Persona Bajo los Efectos de Bebidas Embriagantes, Drogas o Sustancias Controladas de 16 de enero de 2021.

Exhibit 7 del Ministerio Público, Acreditaciones de operación de radar, fotómetro y operación de instrumento Intoxilyzer 9000 & t00 EN y Alco-Sensor.

Exhibit 8 del Ministerio Público, Certificación del Departamento de Salud a Antonio Hernández Meléndez para la operación del instrumento Intoxilyzer 9000 y Alco-Sensor de 20 de enero de 2021.

Exhibit 9 del Ministerio Público, Comunicación de 14 de enero de 2021 dirigida al Insp. Gaby Pérez Cintrón, Director del Negociado de Patrullas de Carreteras de la Policía de Puerto Rico sobre la extensión de vigencia para las licencias de operador de Intoxilyzer 9000 de los agentes de la Policía de Puerto Rico.

[19] Exhibit 1 de la Defensa, Hoja informativa al Flebotomista.

Exhibit 2 de la defensa Hoja informativa al Intervenido.

[20] Apéndice I del *recurso de certiorari*, págs. 1-24.

Ley Número 76 de 30 de diciembre de 2021, al concluir que la acusada no retiró el consentimiento implícito, y consintió implícitamente, libre y voluntariamente, a someterse a la toma de la muestra de sangre sin orden judicial.

**SEGUNDO ERROR**: Erró el Tribunal de Instancia al no suprimir la prueba de alcohol a pesar de que el Estado violó el debido proceso de ley y la protección contra registros y allanamientos irrazonables a la acusada, basado en que el agente Hernández la sometió a una prueba de alcohol, luego de una lectura errónea de las advertencias de ley, consistente en que le leyó las "Advertencias de persona bajo los efectos de bebidas embriagantes, drogas o sustancias controladas" (PPR 615.6), sin tener motivos fundados propios ni transferidos, para creer que la acusada estaba conduciendo o haciendo funcionar un vehículo de motor, bajo los efectos de bebidas embriagantes.

**TERCER ERROR**: Erró el Tribunal de Instancia al no suprimir la prueba de alcohol a pesar de no haberse cumplido con varias disposiciones mandatorias y esenciales del Reglamento 9234 del Departamento de Salud, en violación al debido proceso de ley sustantivo y procesal y la protección contra registros y allanamientos irrazonables de la acusada.

Por su parte, el 23 de enero de 2024, el Pueblo compareció ante nosotros, representado por la Oficina del Procurador General, (el Procurador), presentando escrito en oposición al recurso de *certiorari*.

c.

En el primer error señalado la peticionaria se muestra contraria a la conclusión alcanzada por el foro recurrido, -de que había consentido implícitamente a la toma de muestra de sangre sin una orden judicial-, impulsando, en contrario, que *la prueba dejó claramente establecida una consistente negativa, objeción y resistencia mediante expresiones verbales a la extracción de la muestra de sangre.*[21] Así, el argumento principal de la peticionaria para solicitar la supresión de la prueba de sangre descansa en su convencimiento de que *la prueba desfilada en la vista claramente establece* que, *mediante gestos y lenguaje corporal, objetó y se resistió al proceso de extracción de muestra de sangre.*[22] En la misma tónica la peticionaria afirma que, *conforme a la transcripción de la vista,* resulta evidente su consistente *negativa, objeción y resistencia a someterse*

---

[21] Recurso de *certiorari*, págs.11-15.
[22] *Íd.*

*voluntariamente a la extracción de la muestra de sangre, <u>estando el récord</u> <u>del tribunal ausente de prueba</u> que demuestre que la acusada obedecía sin protestar al pedido de los agentes y de la enfermera, que demuestre su intención de consentir a la extracción de la muestra de sangre, de manera clara e inequívoca y sin mediar coacción física o sicológica para obtener el consentimiento.*[23] (Subrayado provisto).

Como se sabe, el magistrado que presida una vista sobre supresión de evidencia está facultado para adjudicar o dirimir credibilidad en la misma, según aquí lo hizo y dejó manifiesto en la *Resolución* recurrida. *Pueblo v. Bonilla Romero*, 120 DPR 92 (1987). Según lo subrayado en el párrafo que precede, resulta evidente que la peticionaria solicita nuestra intervención **con la apreciación y adjudicación de credibilidad que hizo el foro primario en la vista de supresión de evidencia, luego de sopesar los testimonios que tuvo ante sí,** al determinar que esta prestó su consentimiento voluntariamente para que se le realizara la prueba de sangre, de manera implícita.

Sobre ello, resulta ya trillado, por reiterado, que cuando se cuestiona y señala que el foro primario erró en su apreciación de la evidencia, *el alcance de nuestra función revisora está limitado por consideraciones de extrema valía, pues no podemos perder de perspectiva que* ***nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos***. (Énfasis provisto). *Pueblo v. Toro Martínez*, 200 DPR 834 (2018). Es así pues, *el juez del TPI es ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contracciones, manierismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. Íd.* **Un tribunal**

---

[23] *Íd,* pág. 14.

*revisor tiene vedado intervenir con la adjudicación de credibilidad de los testigos, ni puede sustituir las determinaciones de hechos que, a su amparo, haya efectuado el foro primario basado en sus propias apreciaciones*. (Énfasis y subrayado provistos). *Íd*.

A raíz de lo anterior, **no** debemos (los foros apelativos) intervenir con la apreciación y adjudicación de credibilidad que con relación a la prueba testifical hubiese realizado el juzgador de los hechos a nivel de instancia, **en ausencia de pasión, prejuicio, parcialidad o error manifiesto**. *Pueblo v. Hernández Doble*, 210 DPR 850 (2022). Incurre en pasión, prejuicio o parcialidad el juzgador que *actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias, o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que someta prueba alguna*. *Íd*. Sobre el referido *error manifiesto* nuestro alto Foro considera que acontece, *cuando la apreciación de la prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble*. *Íd*.

Por último, sobre el mismo tema, es al TPI a quien corresponde **dirimir la prueba testifical cuando surgen conflictos de credibilidad en la prueba de cargo, estando dicho foro primario en mejor posición que el apelativo para efectuar tal ejercicio valorativo sobre la prueba conflictiva, que debe prevalecer**. (Énfasis y subrayado provistos). *Pueblo v. Maisonave*, 129 DPR 49 (1991).

Partiendo de la limitada función revisora que se nos reconoce sobre la apreciación de la prueba testifical que efectúa el foro primario, arriba descrita, el examen de la transcripción de la prueba oral desfilada en la vista de supresión de evidencia de este caso nos ha servido para confirmar la ausencia de las circunstancias que nos habiliten para intervenir con el juicio de credibilidad ejercido por el foro primario, pues no exhibe rastro de pasión, prejuicio, parcialidad o error manifiesto. En este sentido,

escudriñada las declaraciones de la enfermera y el agente que intervinieron con la peticionaria en el hospital, no podemos afirmar que la apreciación de la prueba del juzgador de los hechos se hubiese *distanciado de la realidad fáctica* o sea *inherentemente imposible o increíble,* como tampoco detectamos la intervención de *pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Hernández Doble,* supra*; Pueblo v. Toro,* supra.

En consecuencia, no estamos en posición de descartar que, luego del foro recurrido haber escuchado testificar a la enfermera, concluyera que la peticionaria había accedido voluntariamente, de manera implícita, a que la primera le tomara la muestra de sangre para realizar la prueba de alcohol. Es decir, ya leídas las declaraciones de la enfermera en dicha vista, no podemos concluir que lo que allí narró fuera *inherentemente increíble o imposible,* respecto al detallado proceso de cómo le tomó la muestra a la peticionaria, (a lo que se podía negar). La enfermera estableció que, una vez le explicó el proceso a la peticionaria, acto seguido **esta extendió el brazo**, de manera libre, para que le procediera a tomar la muestra, acompañado de la expresión *"dale, dale".* **El TPI dio entera credibilidad a esta versión de los hechos narrada por la enfermera, que fue contraria a la alegación de la peticionaria de que fue *obligada* a extender el brazo para tomarle la prueba de sangre**. Sobre lo mismo, no nos parece *inherentemente increíble,* menos aún *imposible,* la conclusión del Tribunal de que nada le impedía a la peticionaria haberse negado a que se le tomara la referida muestra, accediendo a ello de forma voluntaria, recayendo la obtención de dicho consentimiento primordialmente en las funciones habituales del ejercicio de la enfermería. Menos aún observamos que acontezcan las circunstancias que nos muevan a concluir que se equivocó el foro primario al determinar que la peticionaria no fue amenazada, engañada o compelida a tomarse la muestra.

A igual juicio llegamos sobre la conclusión del TPI de que, evaluado el testimonio del agente Hernández Meléndez, este: había dado cumplimiento a la lectura de las advertencia de ley particulares a las personas en presunto estado de embriaguez; no ejerció coacción física o sicológica hacia la peticionaria para que permitiera tomarse la prueba de sangre; tampoco había realizado representaciones falsas a la peticionaria para lograr que se realizara la prueba de sangre, ni esta fue amenazada, intimidada o maltratada por los agentes de manera que se viciara el consentimiento para obtener la prueba de sangre. Es decir, en manera alguna podemos divisar que las conclusiones del TPI respecto al testimonio de este agente fueran *inherentemente increíbles o imposibles*.

Ciertamente, al examinar en conjunto los testimonios de la enfermera y el agente Hernández Meléndez surgen ciertas inconsistencias o contradicciones sobre cómo aconteció la referida toma de muestra de sangre de la peticionaria. Sin embargo, precisamente, de la *Resolución* recurrida resulta evidente que el foro primario, (ante cuyos ojos desfiló la prueba testifical), dirimió los testimonios de dichos testigos, y adjudicó credibilidad sobre la controversia medular, determinando que la toma de la prueba de sangre no fue compelida sino voluntariamente ofrecida. Valga a este punto recalcar que, **cuando surgen conflictos de credibilidad en la prueba de cargo, es el foro primario el que está en mejor posición que este foro apelativo, para efectuar tal ejercicio valorativo sobre la prueba conflictiva, por lo que es la determinación del TPI la que debe prevalecer**. (Énfasis y subrayado provistos). *Pueblo v. Maisonave*, 129 DPR 49 (1991). Además, recuérdese que *aun cuando no haya un testimonio "perfecto" es al juzgador de los hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de un testimonio que no sean aceptables, el mero hecho de que un testigo incurra en ciertas contradicciones no significa que se deba descartar absolutamente el resto de la declaración cuando nada increíble o improbable surge*

*de su testimonio. Pueblo v. Toro Martínez,* supra; *Pueblo v. Chévere Heredia,* 139 DPR 1 (1995).

En ausencia de una determinación por este Foro intermedio de que los testimonios de cargo resultaran *inherentemente increíbles o imposibles,* simplemente quedamos impedidos de pretender imponer nuestro criterio sobre el del foro ante el cual desfiló la prueba testifical. En modo alguno consideramos que, vista la prueba testifical, resultara *inherentemente increíble o imposible* que la peticionaria consintiera voluntariamente a la toma de la muestra de sangre, de manera implícita, por lo que estamos obligados a mostrar deferencia por la determinación de hecho a la que llegó el foro recurrido respecto a tal asunto medular. Menos aún podríamos sostener que las conclusiones de hechos del juez que las adjudicó fueran el resultado de una actuación movida *por inclinaciones personales de tal intensidad que adoptara posiciones, preferencias o rechazo con respecto a las partes o sus causas sin importar la prueba recibida e incluso antes de que sometiera prueba alguna. Pueblo v. Toro Martínez,* supra.

Acoger la teoría legal de la peticionaria, de que sus actuaciones debieron denotar el rechazo a la toma de las muestras de sangre, sería precisamente permitirnos sustituir el criterio del foro primario por el nuestro al sopesar la prueba testifical que desfiló ante sus ojos, los que nos resulta vedado, salvo que apreciemos que el testimonio resultó inherentemente increíble o imposible, ninguna de las cuales aquí apreciamos.

No hay duda de que un registro efectuado sin mediar una orden judicial activa la presunción de que fue irrazonable e inválido. *Pueblo v. López Colón,* 200 DPR 273 (2018). Esto porque el Artículo II, Sección 10 de nuestra Constitución dispone, en lo pertinente, que únicamente serán expedidos mandamientos autorizando registros, cuando exista causa

probable apoyada en juramento o afirmación[24]. Por tanto, cuando se aspire a efectuar un registro será necesario, en lo ordinario, obtener previamente una orden judicial. *Pueblo v. López Colón*, supra.

Sin embargo, el registro consentido voluntariamente, de forma expresa o implícita, es una de las situaciones excepcionales en las que nuestro Tribunal Supremo ha reconocido que no será indispensable una orden judicial previa. *Pueblo v. Báez López* 189 DPR 918 (2013). El consentimiento implícito se refiere a cuando una persona no accede expresamente al registro, pero sus actos, en unión a un examen de la totalidad de las circunstancias, demuestra su intención de consentir el registro. *Pueblo en interés del menor NOR*, 136 DPR 949 (1994). Al evaluar si la renuncia fue expresa o tácita se toman en consideración los siguientes factores: 1) si medió fuerza o violencia; 2) si el registro fue practicado después de un arresto, y 3) si se encontraban otras personas presentes. *Íd.* pág. 966; *Pueblo v. López Colón*, supra, pág. 289. A esto es necesario añadir que, la prueba sobre la aludida renuncia debe ser clara y demostrativa de la inexistencia de coacción verdadera de clase alguna, directa o indirecta. *Pueblo en interés menor NOR*, supra, pág. 966.

Por lo que explicamos al considerar el análisis de la prueba testifical efectuada por el foro recurrido, sostenemos que no acontecen las circunstancias que nos habilitarían para intervenir con la valoración de la prueba testifical del tribunal *a quo*, al este concluir que la peticionaria consintió voluntariamente, de manera implícita, a que se le tomara la prueba de sangre.

En su segundo error la peticionaria lo dedica casi por entero a argumentar sobre la presunta carencia de motivos fundados propios o transferidos del agente Hernández, para someterla a una prueba de sangre para detectar posible embriaguez. Sin embargo, habiendo ya este foro intermedio concluido que no vamos a intervenir con la conclusión del TPI

---

[24] Art. II, Sec. 10, Const. E.L.A., LPRA Tomo 1.

en términos de que la peticionaria consintió voluntariamente a que se le tomara la muestra de sangre, no resulta necesario entrar en consideraciones sobre si dicho agente contaba o no con motivos fundados para obtener la aludida prueba de sangre. Según se sabe, no se requieren motivos fundados para llevar a cabo un registro allí donde se cuenta con el consentimiento voluntario de la persona a ser registrada. *Pueblo v. Báez López*, 189 DPR 918 (2013).

Finalmente, el último error señalado por la peticionaria también refiere a una determinación sobre la credibilidad que le mereciera al TPI el testimonio de la enfermera, sobre el proceso o pasos seguidos por esta al tomar la muestra de sangre. La peticionaria promueve que, por causa de las contradicciones entre los testimonios de la enfermera y el agente Hernández, se debió haber considerado que el proceso llevado a cabo para la toma de muestra de sangre no tuvo ningún valor probatorio, pues fueron incumplidos los requisitos mínimos exigidos.

No obstante, la *Resolución* recurrida muestra, sin ambages, que el foro primario se ocupó expresamente de dicho argumento esgrimido por la peticionaria, y concluyó que, dirimidos los testimonios de la enfermera y el agente Hernández, estos siguieron en lo esencial el proceso para garantizar la toma adecuada de la prueba de sangre y posterior disposición. Según concluimos respecto al consentimiento implícito que dio la peticionaria para que se le tomara la muestra de sangre, también determinamos que los testimonios de tales testigos respecto al proceso seguido para la toma de la muestra de sangre, y posterior curso, no resultan *inherentemente increíbles o imposibles,* como tampoco observamos la intervención de pasión, prejuicio o parcialidad en el dictamen del foro recurrido al respecto que justifique nuestra intervención.

En definitiva, las conclusiones de hechos alcanzadas por el foro primario están sostenidas por la prueba testifical que tuvo ante sí, y no acontecen las circunstancias excepcionales que nos permitirían interferir

con la esencial función de dicho tribunal al dilucidar credibilidad y dirimir posibles incongruencias entre los testimonios de la prueba de cargo.[25]

d.

Por los fundamentos que anteceden, denegamos la expedición del recurso solicitado.

Lo acordó el Tribunal y lo certifica su Secretaria. El juez Bermúdez Torres disiente con voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[25] Respecto al *Voto disidente* suscrito por el muy respetado juez Bermúdez Torres, presidente de este Panel, solo cabe señalar que termina incurriendo en la práctica de *sustituir las determinaciones de hechos que efectuó el foro primario por sus propias apreciaciones,* a pesar de que nuestro Tribunal Supremo fue preclaro en *Pueblo v. Toro Martínez*, supra, de que, como foro revisor, nos es vedado obrar así. Por ello, a poco examinar *el inciso A* del referido voto disidente, es palpable cómo el apreciado compañero juez invisibilizó por completo el testimonio de la enfermera, al esta narrar la disposición de la peticionaria para que se le tomara la muestra de sangre, y se decantó por resaltar algunas porciones del testimonio del agente que pudieran resultar conflictivas. Correspondía al TPI, no a este foro intermedio, resolver cualquier conflicto en la prueba testifical respecto a cómo ocurrió la toma de la muestra de sangre, y dicho foro recurrido así lo hizo, identificando con precisión el valor probatorio que le mereció cada testimonio para concluir que la peticionaria no fue coaccionada, sino que más bien consintió a la prueba. A fin de cuentas, **por cuanto las determinaciones de hechos necesariamente preceden el derecho a ser aplicado, solo hubiese resultado dable una aplicación distinta del derecho si partimos de las determinaciones de hechos efectuadas por el TPI**, pero el *Voto disidente* no se atuvo a la limitada función revisora de los hechos que nos correspondía.

| EL PUEBLO DE PUERTO RICO<br><br>Recurrido<br><br>v.<br><br>ZAIDA COLÓN JUSTINIANO<br><br>Peticionaria | KLCE202301125 | *Certiorari*<br>procedente del<br>Tribunal de<br>Primera Instancia,<br>Sala de Bayamón<br><br>Caso Núm.<br>D LE2022G0065<br>D LE2021M0062<br><br>Sobre:<br>ART. 7.06 y 7.02 Ley<br>de Vehículos y<br>Tránsito (Ley 22) |
|---|---|---|

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Adames Soto y la Juez Aldebol Mora

## VOTO DISIDENTE DEL JUEZ BERMÚDEZ TORRES

### I.



En su contexto más básico, las determinaciones de hechos, las conclusiones de derecho y los dictámenes discrecionales son los tres tipos de decisiones judiciales sujetas a revisión judicial. Cada una de estas decisiones son evaluadas a través de estándares de revisión distintos.[1] En lo aquí estrictamente pertinente, las primeras, es decir, las conclusiones de derecho se **revisan bajo el estándar de *novo* o independiente**, el cual no concede ningún grado de deferencia al tribunal de primera instancia. Las determinaciones de hechos, en cambio, se revisan empleando el estándar de error manifiesto[2] exigente del más alto grado de deferencia al tribunal revisado.

Ahora bien, existen **controversias mixtas de hechos y de derecho** que exigen separarse a los fines de aplicar el estándar de revisión apropiado. En esa tarea, en ocasiones compleja, se tiene que separar las

---

[1] *Pierce* v. *Underwood*, 487 US 552, 558 (1988), 108 S.Ct. 2541, 101 L.Ed. 2d 490. Véase, además: *Pueblo* v. *Medina Cardona*, KLCE202000750.

[2] *Dávila Nieves* v. *Meléndez Marín*, 187 DPR 750 (2013).

inferencias directas -determinaciones de hechos- de las que no lo son -determinaciones jurídicas o de derecho- para aplicar el estándar de revisión correspondiente a cada una. Cuando la inferencia resulta directa del hecho probado, se aplica la deferencia debida a las determinaciones de hechos y su estándar de error manifiesto. **En cambio, si del hecho probado o del hecho inferido de este, se deducen o infieren otras conclusiones de hecho o de derecho que sean más de carácter jurídico que fáctico, entonces se considera una conclusión de derecho, a la cual le aplica el estándar de revisión *de novo* o independiente.**[3]

La controversia que hoy atendemos es precisamente un ejemplo de una cuestión mixta de hechos y de derecho, cuyo análisis no puede limitarse a la aplicación automática del estándar de error manifiesto o el *de novo* o independiente. Las cuestiones relativas a cómo ocurrió el evento de la extracción de sangre de la Sra. Zaida Colón Justiniano son determinaciones puras de hechos, pero, **la determinación de si la detenida Colón Justiniano reiteró o retiró el consentimiento implícito dispuesto en la Ley, a que le realizaran las pruebas para detectar alcohol en su organismo, constituye una cuestión más jurídica que fáctica.** A las primeras, tal y como muy correctamente han hecho los distinguidos compañeros de Panel, le aplica el estándar de error manifiesto, mientras que, a la segunda, le aplica el estándar de *novo* o independiente, cosa que omite el análisis de la Mayoría. Mediante este voto disidente, procedo a hacerlo.



II.

Del relato fáctico relevante podemos concluir, que, tras acudir a investigar la ocurrencia de un accidente, el agente Francisco Ortiz Ríos le solicitó al agente Antonio Hernández Meléndez que le ayudara con la prueba de alcohol. Le indicó que los conductores de los vehículos

---

[3] *Sanabria v. Sucn. González*, 82 DPR 885 (1961).

involucrados se encontraban uno, en el hospital HIMA San Pablo y el otro, en el Doctor Center de Bayamón. Contando con ciertos datos personales de la señora Colón Justiniano, entre ellos, el nombre y la descripción de la ropa, el agente Hernández Meléndez se transportó junto al agente Víctor Lasalle, al cuartel Patrullas de Carreteras de Bayamón a buscar un envase (jetpack) para realizar la prueba de alcohol.

Ya en la facilidad hospitalaria, el agente Hernández Meléndez identificó a la acusada acompañada de su esposo en el pasillo del área de *triage*, semi sentada en una camilla con una mascarilla puesta. Se acercó a ella y le indicó que le extraería una muestra de sangre como parte del protocolo de accidentes graves y fatales. Tras leerle las *Advertencias de Persona Bajo los Efectos de Bebidas Embriagantes* frente a su esposo, le preguntó si las entendió y ésta afirmó con la cabeza que las entendió. Sin embargo, la señora Colón Justiniano negó con su cabeza firmar el documento de las advertencias.

Ante la negativa a firmar, el agente Lasalle, que acompañaba al agente Hernández Meléndez, le advirtió al esposo de la señora Colón Justiniano que ella tenía que firmar las advertencias. Entonces, a instancias de los agentes, el esposo le pidió a la señora Colón Justiniano que firmara. Esta nuevamente se negó a hacerlo. Ante ello, el agente Lasalle firmó las advertencias como testigo de su lectura.

Luego, los funcionarios procedieron con la toma de la muestra de sangre. La enfermera Viviana Alicea abrió el *jetpack*, y le informó a la señora Colón Justiniano que le habría de extraer sangre. La señora Colón Justiniano **reaccionó en negativa, pegando su brazo a su cuerpo, retraído en un ángulo de noventa (90) grados.** Ante la exigencia de la enfermera a que extendiera el brazo, la señora Colón Justiniano insistió con su cabeza en negarse.

Esta vez, el agente Hernández Meléndez intervino **exigiéndole a la enfermera que continuara con la extracción de sangre y pidió al esposo de la señora Colón Justiniano que lo ayudara a convencerla a que accediera a la extracción. El esposo, siguiendo las instrucciones del agente, le pidió a su esposa que cooperara, a lo que esta, nuevamente se negó.** Eventualmente, la enfermera haló y estiró el brazo de la señora Colón Justiniano para poder sacarle la sangre. Luego de retirar el brazo en más de una ocasión durante el proceso para tomarle la muestra de sangre, la señora Colón Justiniano hizo un gesto con la mano para que la enfermera avanzara, mientras su esposo intervenía por tercera vez para pedirle que cooperara. Extraída la muestra, la señora Colón Justiniano no quiso firmar el documento de "Parte de Remisión" a la enfermera y al agente Hernández.



De lo declarado por los diferentes testigos que declararon en la vista de supresión de evidencia, no hay mayores ni sustanciales diferencias respecto a cómo transcurrió el evento de la extracción de sangre. De todos modos, a la determinación de la ocurrencia de esos hechos, concedemos amplia deferencia al juzgador de primera instancia. Ello no implica, que, a la luz de tales hechos, la inferencia qué de tales hechos derivó el foro recurrido, esto es, que la señora Colón Justiniano prestó su consentimiento válidamente para la extracción de la muestra de sangre, sea una cuestión de hechos a la que debemos igual deferencia. Por el contrario, **se trata de una inferencia de los hechos más jurídica que fáctica, cuya revisión exige se aplique el estándar de *novo* o juicio independiente, bajo el cual no debemos ninguna deferencia al foro adjudicador.** Sencilla y llanamente, estamos ante la revisión de la aplicación correcta del derecho a los hechos probados. Acometamos la tarea.

### III.

Igual que la 4ta Enmienda de la Constitución Federal, la Sección 10 del Artículo II de la Constitución del E.L.A., limita la intrusión no justificada del Estado o cuando, estando justificada, se realiza inapropiadamente. En el contexto de casos de conducción de vehículos de motor bajo los efectos del alcohol, distinto a otras garantías constitucionales, la extracción de sangre sí tiene serias implicaciones sobre el derecho a la protección contra registros y allanamientos irrazonables, establecido en la 4ta Enmienda de la Constitución Federal. Como regla general es necesario que los agentes del orden público obtengan una orden, expedida por autoridad judicial, antes de efectuar un registro.[4] Esta garantía dimanante de ambas Constituciones,[5] protege a todo ciudadano contra la intrusión irrazonable en el cuerpo humano por parte del Estado para la toma de muestras de sangre con el fin de ser utilizadas en una investigación criminal.[6]

Como sabemos, en Puerto Rico se admite como prueba sustantiva de embriaguez el resultado del análisis de sangre obtenido en contra de la voluntad del conductor detenido. El estatuto quita a la persona intervenida el derecho a negarse a realizarse la prueba de alcohol y a escoger el tipo de análisis que desea se le efectúe.[7] Si el intervenido se negare, objetare, resistiere o evadiere someterse al procedimiento de las pruebas de alcohol, drogas o sustancias controladas, el oficial del orden público tiene la facultad de arrestar a la persona con el fin de trasladarle a una facilidad médico-hospitalaria para que el personal certificado por el

---

[4] *Pueblo* v. *Martínez Torres*, 120 DPR 496 (1988); *Pueblo* v. *Muñoz Santiago*, supra; *Pueblo* v. *Ramos Santos*, 132 DPR 363 (1992).
[5] LPRA Tomo 1, ed. 2008, pág. 326.
[6] *Schmerber* v. *California*, 384 US 757, 767 (1966).
[7] Las personas muertas o inconscientes se les considera como que no retiraron su consentimiento. Véase: Art. 7.09 (b), Ley de Vehículos y Tránsito de Puerto Rico, 9 LPRA § 5209(b).

Dpto. de Salud proceda a extraerle las muestras pertinentes, **previa orden judicial.**[8]

Esta última expresión estatutaria, referente a que la extracción de la muestra de sangre se haga luego de obtener una orden judicial, fue producto de la enmienda al inciso (a) del Art. 7.09 de la vigente Ley Núm. 22, promulgada por nuestra Asamblea Legislativa, mediante la Ley Núm. 76-2021. Sin duda, ello es consecuente con la más reciente normativa expuesta por el Tribunal Supremo de Estados Unidos y de nuestro Tribunal Supremo local.

Para un gran sector de juristas, una expresión tan tajante y clara como esa, refleja indubitadamente que el Legislador tuvo el propósito de impedir absolutamente la toma de muestras sin que medie una orden judicial. Aunque considero que nunca fue la intención de la Asamblea Legislativa eliminar las doctrinas de excepción constitucional, ciertamente  la actuación legislativa es un reflejo inequívoco de la importancia y transcendencia que le otorga a la intervención de un juez previo a la extracción de sangre en contra de la voluntad de un detenido por conducir bajo los efectos de bebidas embriagantes. Por ello, soy consciente de que, la conclusión a la que se llegue sobre si se configuró o no una de las excepciones a la norma general de exclusión constitucional, tiene que estar sustentada por el más riguroso y exhaustivo análisis de las exigencias constitucionales concernidas. En palabras del Tribunal Supremo de Estados Unidos, **"The point of the Fourth Amendment,** which often is not grasped by zealous officers, **is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often**

---

[8] La Ley Núm. 76-2021 enmendó el estatuto para incluir que la extracción de muestra sea previa orden judicial.

**competitive enterprise of ferreting out crime.**"[9] Thus, **"[w]e cannot [...] excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative".**[10]

Como una de las excepciones a la norma general de exclusión de evidencia obtenida sin orden judicial, la doctrina ha reconocido el consentimiento de la persona a que se realice el registro, es decir, se extraiga sangre de su cuerpo. Precisamente, la Ponencia Mayoritaria sostiene, que la señora Colón Justiniano implícitamente consintió válidamente a que se le extrajera la muestra de su sangre. Examinemos entonces, la validez o voluntariedad del consentimiento, alegadamente prestado por la señora Colón Justiniano para que se extrajera una muestra de su sangre.



Como sabemos, por tratarse de una excepción a la norma constitucional, si el acusado solicita la supresión de evidencia alegando que el consentimiento fue producto de coacción directa o indirecta por parte del Estado, el Ministerio Público es quien tiene que demostrar la voluntariedad del consentimiento.[11] **La renuncia al derecho a que medie una orden judicial autorizando el registro, debe ser establecida por prueba clara y positiva, demostrativa de que no existió coerción de clase alguna. El consentimiento no debe estar sujeto a interpretación. Debe ser claro e inequívoco.**[12]

En la evaluación de la validez del consentimiento debemos considerar las características de la persona que ha consentido al registro, así como **el ambiente en el cual se llevó a cabo el mismo**. En cuanto al ambiente en el que se otorga el consentimiento, debe analizarse "si la persona que [se alega] consintió fue amenazada, intimidada físicamente o

---

[9] *Johnson* v. *Unites States*, 333 US 10, 13-14 (1948).
[10] *McDonald* v. *United States*, 335 US 451, 456 (1948).
[11] *Bumper* v. *North Carolina*, 391 US 543, 548 (1968).
[12] *Pueblo* v. *Tribunal Superior*, 96 DPR 270, 272 (1968).

maltratada por la Policía, si descansó en representaciones falsas de la Policía y si estaba en un lugar público o aislado."[13]

Al respecto, en *Cámara v. Municipal Court of City and County of San Francisco*,[14] se concluyó que, cuando no existe una emergencia exigiendo el acceso inminente y una persona exige o insiste que las autoridades gubernamentales **no efectúen un registro** sin previa orden judicial la Constitución impide la condena por negarse a dar el consentimiento al registro.[15]

Retirado el consentimiento implícitamente brindado -por ficción jurídica- por un conductor a que se le extraiga una muestra de sangre, solo se justifica la extracción de la muestra sin orden judicial, si se cumple a cabalidad con todas las exigencias constitucionales. En tal sentido, en *Missouri v. McNeely*,[16] el Tribunal Supremo Federal mantuvo la norma de que un registro personal sin orden judicial puede ser razonable en casos de extracción de sangre donde existan circunstancias apremiantes. Sin embargo, aclaró que la mera absorción de alcohol no es suficiente *per se* para establecer la circunstancia apremiante que releve a las autoridades de obtener una orden judicial previa.[17] La absorción natural del alcohol en la sangre puede justificar la existencia de circunstancia apremiante en ciertos casos, pero no de forma automática ni categórica.



Por medio de *dictum*, el Tribunal Supremo de Estados Unidos en *Mcneely* destacó algunos de los factores que se pueden considerar. Estos son: 1) una situación de emergencia;[18] 2) los procedimientos disponibles para adquirir una orden;[19] 3) retrasos previstos en la obtención de una

---

[13] *Pueblo v. Santiago Alicea I*, supra, pág. 237; *Pueblo v. Santiago Alicea I*, supra.
[14] 387 US 523, 540 (1967).
[15] Id. at 540. Situaciones análogas surge en situaciones donde hay que sopesar el derecho a la libertad de expresión vs. alteración a la paz o exposiciones obscenas.
[16] *Missouri v. McNeely*, 569 US 141 (2013).
[17] *Richards v. Wisconsin*, 520 US 385 (1997).
[18] *Id.*, pág. 1567.
[19] *Id.*, pág. 1568.

orden judicial;[20] 4) demoras inusuales en la obtención de una orden judicial;[21] 5) demoras por el curso normal del proceso de solicitud de orden judicial;[22] 6) la disponibilidad de un magistrado para emitir la orden;[23] 7) la necesidad de la policía para atender un accidente de tránsito;[24] 8) la metabolización natural del alcohol en la sangre;[25] así como 9), los problemas prácticos de obtener una orden judicial dentro de un marco de tiempo que conserve la oportunidad para obtener evidencia confiable.[26]

En Puerto Rico, el Tribunal Supremo ha indicado que ni siquiera la excepción de situaciones de emergencia "significa que todo accidente de tránsito constituya, por sí mismo, una emergencia médica que conlleve la aplicación de la excepción propia de una situación de emergencia".[27]



En la vista a la que el acusado tiene derecho para que el Estado demuestre, además de motivos fundados e indicios claros, la existencia de las circunstancias apremiantes, los tribunales tienen que evaluar cuidadosamente, **primero, si la obtención de la orden judicial previa es razonablemente factible. Si lo es, a la luz de los avances tecnológicos que facilitan y adelantan su expedición, los agentes están obligados a obtenerla.**[28] Si la obtención de la orden judicial no es factible, el tribunal tiene que evaluar, entre otros factores, la pérdida de la evidencia -por ciento de alcohol en el organismo-, ocasionada por la metabolización natural del alcohol en el torrente sanguíneo. Ello, dirigido a concluir que

---

[20] *Id.*, pág. 1568. ("No doubt, [...] cases will arise when anticipated delays in obtaining a warrant will justify a blood test without judicial authorization").
[21] *Id.*, pág. 1567.
[22] *Id.*, pág. 1563.
[23] *Id.*, pág. 1568.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Pueblo* v. *Báez López*, 189 DPR 918, 933 (2013).
[28] Véase: *McDonald* v. *United States*, 335 US 451 (1948). Hoy día es muy posible iniciar y concluir el proceso de solicitud de la orden judicial, aun desde las mismas patrullas o vehículos de la Uniformada, a través de una computadora o desde el mismo teléfono móvil. *State* v. *Hay*, 946 N.W.2d 190 (2020).

existen circunstancias extraordinarias que justifican extraer sangre sin orden judicial pues la obtención de dicha orden es impracticable.

**En otro ángulo importante de la discusión de este caso, es importante distinguir entre lo que constituye no consentir a que se extraiga la muestra de sangre y lo que es oponerse a que se realice la extracción utilizando fuerza física.** En el primer caso, la persona que se niega o no presta su consentimiento a la extracción de sangre puede muy bien cooperar con el personal hospitalario para que se le extraiga la sangre sin que ello implique que consintió y renunció con ello a su derecho a que se obtenga previamente una orden judicial. El segundo supuesto ocurre cuando la persona, además de no prestar su consentimiento opone resistencia o fuerza física para evitar que se le extraiga la sangre. Ambos casos han sido atendidos diferenciadamente por basta jurisprudencia federal,[29] aplicándole criterios diferentes al revisar la validez del procedimiento.[30]



A.

De los hechos particulares de este caso surge que, tras identificar a la señora Colón Justiniano, los agentes Hernández Meléndez y Lasalle, se dispusieron a extraerle las muestras de sangre. Tras los agentes informarle que le extraería una muestra de sangre como parte del protocolo de accidentes graves y fatales, la señora Colón Justiniano se negó a firmar las advertencias de ley correspondientes a estos casos que le leyó el agente. A pesar de la colaboración brindada por el esposo de la señora Colón Justiniano para que esta accediera a firmar las advertencias, esta insistió en no hacerlo. Este fue el primer incidente en que era obvio y fácilmente detectable, el sentir de la señora Colón Justiniano en no consentir a que se le realizara la extracción de sangre.

---

[29] Véase: *Hammer* v. *Gross*, 932 F.2d 842 (1991); *People* v. *Ryan*, 171 Cal. Rptr 854 (1981).
[30] Se sigue la doctrina establecida en *Graham* v. *Connor*, 490 US 386 (1989).

Cuando la enfermera Viviana Alicea se disponía a extraerle la sangre, la señora Colón Justiniano reaccionó flexionando su brazo un ángulo de noventa (90) grados y pegándolo a su cuerpo, de manera de que no pudiera extraérsele la muestra. Ante la exigencia de la enfermera a que extendiera el brazo, la señora Colón Justiniano insistió con su cabeza en negarse.

Tan evidente era la negativa de la señora Colón Justiniano, que el agente Hernández Meléndez, en lugar de solicitar una orden judicial, recurrió al esposo de la señora Colón Justiniano para que lo ayudara a convencerla a que accediera a la extracción. El esposo, siguiendo las instrucciones del agente, le pidió a su esposa que cooperara, a lo que esta, nuevamente se negó.



A pesar de que evidentemente la señora Colón Justiniano había retirado su consentimiento implícito y se negaba a que voluntariamente le extrajeran su sangre, el agente no hizo ninguna gestión para solicitar al tribunal que expidiera una orden para poder obtener la muestra en contra de su voluntad. Transcurrido un periodo de tiempo, la señora Colón Justiniano, presumiblemente presionada por la presencia de los agentes de la Policía y, peor aún, de su esposo quien le insistía en que cooperara, finalmente **no opuso resistencia ni empleó fuerza física para evitar a que se le extrajera la muestra**. En ese momento la enfermera le haló y estiró el brazo para poder sacarle la sangre. Luego de retirar el brazo en más de una ocasión durante el proceso para tomarle la muestra de sangre, la acusada hizo un gesto con la mano para que la enfermera avanzara, mientras su esposo intervenía por tercera vez para pedirle que cooperara. Extraída la muestra, la señora Colón Justiniano no quiso firmar el documento de "Parte de Remisión" a la enfermera y al agente Hernández.

De estos hechos debidamente establecidos se derivan varias conclusiones de derecho importantes. <u>Primero</u>, el retiro del consentimiento

implícito por parte de la señora Colón Justiniano, a través de su conducta no verbal, fue claro desde un principio. Lo evidenció, entre otras cosas, su negativa a firmar las advertencias de ley, seguida de su gesto de encoger su brazo para evitar se le extrajera la muestra de sangre. Igual lo evidenció el hecho de que su esposo tuviera que insistir en varias ocasiones en que cooperara con las autoridades.

Una <u>segunda</u> conclusión es que, ante la falta del consentimiento de la señora Colón Justiniano en que se le extrajera su sangre, los agentes no hicieron el más mínimo esfuerzo de obtener la orden judicial que expresamente ordena la ley que se obtenga antes de extraer la muestra de sangre. Aunque no existía impedimento alguno para hacerlo, optaron por, con el propósito de omitir su deber como funcionarios del orden público, en insistir directa y a través del esposo de la señora Colón Justiniano, en que esta accediera a que se extrajera la muestra de sangre.

<u>Finalmente</u>, el que la señora Colón Justiniano **no se opusiera mediante fuerza física** a que se le extrajera la sangre, no significa que brindó su consentimiento a que se hiciera. Como he indicado, una cosa es no consentir a la extracción y otra es, oponerse a ello mediante fuerza física. En este caso, si bien al final del proceso la señora Colón Justiniano extendió su brazo y le manifestó a la enfermera "dale, dale" para que procediera con la extracción, ello no implicó, como intimó el Foro *a quo* y hoy avalan los compañeros de Panel, que consintiera implícitamente a la extracción de la muestra de sangre.

Por el contrario, los hechos revelan que la señora Colón Justiniano nunca consintió a que se invadiera su cuerpo para extraerse la muestra de su sangre. Al final, agotada por la insistencia de los agentes de la Policía, la enfermera y su esposo, optó por no resistirse a la extracción, aunque nunca prestó válidamente su consentimiento para ello. Al avalar la postura del foro recurrido, pasamos por alto la exigencia doctrinaria

vigente de que el consentimiento no esté sujeto a interpretación, debiendo ser claro e inequívoco.[31]

Por entender que la extracción de la muestra de sangre de la señora Colón Justiniano se apartó del mandato expreso de la ley y violentó su protección constitucional contra registros irrazonables, así como de la doctrina jurisprudencial interpretativa, debió haber sido suprimida. Por ello, respetuosamente disiento.

En San Juan, Puerto Rico, a 19 de marzo de 2024.

Abelardo Bermúdez Torres
Juez de Apelaciones

---

[31] *Pueblo* v. *Tribunal Superior,* supra.